OSCN Found Document:HADDOCK v. STATE OF OKLAHOMA

 

 
 HADDOCK v. STATE OF OKLAHOMA2025 OK CR 24Case Number: F-2025-67Decided: 11/13/2025Mandate Issued: 11/13/2025THE COURT OF CRIMINAL APPEALS OF THE STATE OF OKLAHOMA
Cite as: 2025 OK CR 24, __ P.3d __

 

JENNIFER HADDOCK, Appellant,
v.
STATE OF OKLAHOMA, Appellee.

O P I N I O N

HUDSON, JUDGE:

¶1 Appellant, Jennifer Haddock, appeals a final pretrial order denying her claim of statutory immunity from criminal prosecution and motion to dismiss under 21 O.S.Supp.2018, § 1289.2521 O.S.2021, § 711

¶2 Twelve days before the scheduled preliminary hearing, Haddock moved to dismiss the charges, claiming immunity from prosecution pursuant to the Stand Your Ground law. See generally 21 O.S.Supp.2018, § 1289.25

¶3 Haddock now appeals this ruling under 22 O.S.Supp.2022, § 1051First, Haddock contends that the district court erred in finding Sean Haddock, the decedent, was a tenant at will and that she was a trespasser who was potentially engaged in unlawful activity. Second, Haddock argues the district court abused its discretion by failing to properly consider all relevant facts and law before concluding that she failed to prove that her use of deadly force was justified.

¶4 After careful review, we REVERSE the district court's order denying immunity and REMAND this matter to the district court for further proceedings consistent with this opinion.

FACTS

1. Introduction

¶5 Appellant shot and killed her brother, Sean Haddock, on August 3, 2023, inside their mother's Edmond apartment. Appellant is a Lieutenant with the Edmond Police Department who, at the time of the shooting, was off-duty and carrying a firearm she personally owned and was qualified to carry. The gun was carried in a crossbody bag that Appellant wore over her chest. The record shows that Sean was a homeless drug addict who constantly coerced and harassed his mother, Marcia Ricketson, to give him money to feed his addiction to drugs.

2. Sean Haddock

¶6 By all accounts, Sean was a force to be reckoned with. At 5'8" and 205 pounds, Sean was "extremely stout" and muscular. He regularly worked out with weights and was very fit. Sean was a military veteran who knew how to use his physical strength to his advantage, and he was much stronger physically than Appellant. Sean was a former wrestler and OSU rugby player who in the past did unarmed self-defense courses while employed with the sheriff's department.

¶7 Ricketson testified that Sean was educated in self-defense and "was very capable of taking someone out . . . you can't help but be scared [of him]." In the past, Sean had headbutted his father, Gary Haddock, and broke his nose. Sean had also picked up his stepfather, Robert Ricketson, by the throat and slammed him to the ground in a parking lot. In addition, Sean had punched his brother, Parker, and physically intimidated him in the past.

¶8 Sean's drugs of choice were fentanyl and methamphetamine. When Sean was on drugs, he was volatile, unpredictable and unable to control himself. Sean was very confrontational and physically intimidating when seeking money from his mother or the use of her car. Sean would literally get in her face, verbally berate her, back her against the wall and yell and curse so loudly when she refused to give him money that he spit in her face. He also repeatedly took her car and did not return it. Sean would get angry and punch holes in the doors of his mother's apartment and even destroyed one of her bathrooms. According to Ricketson, Sean was very manipulative and adept at lying to get his way.

3. Ricketson's Apartment

¶9 Sean had not lived with his mother full time since 2021 when he got married and moved out of the apartment. Sean was removed from the lease on Ricketson's apartment at that time. Sean returned to live with his mother temporarily starting in January 2022, after separating from his wife. Ricketson testified that Sean would just show up at her apartment unkept and dirty, asking for a place to sleep or something to eat. It was hard for Ricketson to see her son that way, so she let him inside. Sean stayed with her for a few days at a time during this period.

¶10 Things did not go well during Sean's temporary stay at the apartment. In January or February 2022, Sean demanded that Ricketson give him money. When Ricketson refused, Sean threatened to slit her throat. Ricketson, in turn, called the police and spent the weekend at Appellant's house. Within six weeks, Sean was back in his mother's apartment. Later in 2022, Ricketson called the police and had Sean removed from her apartment because he was intimidating her and had taken every last penny she had. Sean also disappeared with her car for days on end. This time, Ricketson threw Sean out of the apartment for good and told him not to come back.

¶11 Sean thereafter did not have a key to the apartment, he was never there without his mother being present and his name was not on the lease. Sean never stayed at the apartment for any length of time. Still, Sean wanted his mother's money and car so he kept returning to get it. Ricketson believed Sean would physically attack her if she refused.

4. Making a Change

¶12 In December 2022, Appellant made a report to Adult Protective Services after being contacted by Ricketson's best friend expressing concern for Ricketson's well-being. Appellant testified that every time she saw her mother, she looked unhealthy. Appellant also was aware that Sean had cleaned out her mother's funds. Appellant submitted the report to Adult Protective Services when she was unable to reach her mother by telephone. No action was taken on this complaint.

¶13 In 2023, Ricketson's lease was expiring and she made the decision to move out of her apartment and move in with Appellant. Ricketson's long-term disability income was running out and she needed to get her financial situation under control. In January 2023, Ricketson told Sean that she was going to be moving out of the apartment in August and she would not have anything more available for him.

5. Moving Out 

¶14 On August 2, 2023, around 4 p.m., Appellant arrived at Ricketson's apartment to start packing her mother's belongings. Appellant had arranged for movers to arrive by 9 a.m. the next morning to help with the move. The plan was to move Ricketson's things out of the apartment and into Appellant's home. The movers were also going to move a set of black bedroom furniture from the back bedroom to the home of Appellant's father and stepmother, Gary and Marla Haddock, per their instructions to Appellant. Gary and Marla agreed to pay the movers to bring the furniture back to their home.

¶15 The ownership of the black bedroom furniture was fully explored at the hearing. The record shows undisputedly that it belonged to Marla Haddock. In 2019, Marla had agreed to let Sean use it at his mother's apartment. The agreement Marla had with Sean was that the furniture was to remain at Ricketson's apartment, and that it would be moved back to Gary and Marla's home if Ricketson ever moved out. Marla emphasized in her testimony that the bedroom furniture never belonged to Sean and the agreement was that he could only use it at his mother's apartment.

¶16 Sean apparently did have some miscellaneous items remaining at his mother's apartment that were placed into a large moving box. These items included some mail, old dead watches, several broken cell phones and other miscellaneous items. While packing her mother's belongings, Appellant texted Sean and told him to bring their mother's car back and to come get his "shit" out of the apartment. Sean had been gone for three days after borrowing his mother's car earlier in the week, with no indication whatsoever of when he would return. Appellant stayed until midnight packing boxes at her mother's apartment and then left.

¶17 Sean arrived at the apartment a few hours later at 2:00 a.m. on August 3, 2023. Ricketson told him that the black bedroom furniture was going to be moved later that morning to Gary and Marla's house. Sean became angry because he believed that Gary and Marla had given him the furniture. Ricketson testified that Sean stewed on it over the next six hours and "became more and more angry" about losing the furniture. Sean was cursing and started pacing through the apartment. At one point, Sean stated that he would sell the black bedroom furniture on Facebook if necessary. Sean became more amped up and expressed his frustration over the next six hours. Ricketson testified that Sean was not just angry about the furniture, but also about the realization that he no longer would have a place to come to and would no longer have use of his mother's car.

¶18 Appellant arrived back at her mother's apartment a few minutes before 9:00 a.m. on August 3rd. Appellant walked the movers through the apartment and showed them what needed to be moved. When she reached the back bedroom, Sean was standing in the room flipping through some mail. When Appellant showed the movers the black bedroom furniture and told them that it needed to be moved to her dad's house, Sean looked up and said "don't touch the fucking furniture." Appellant knew that the furniture belonged to Gary and Marla so she told the movers "don't pay attention to him."

¶19 Appellant walked to the front door with the movers where she signed the contract and the movers then went outside to get their dollies to begin the move. It was at this point that Sean came down the hall, confronted Appellant and yelled at her that the bedroom furniture wasn't going anywhere. Appellant responded "okay Sean. Well, it's done dude. You don't even have anywhere to put it." Appellant reiterated that the furniture was going back to Gary and Marla's house and that he, Sean, did not live there anymore. Sean responded that he did not care, that he was going to sell the bedroom furniture on Facebook. Sean then told Appellant that she didn't live there and she needed to "get the fuck out of my apartment." When Appellant pointed out that the furniture belonged to their father and stepmother, Sean told Appellant "fuck you" and walked into the kitchen with Ricketson. At this point, both Appellant and Ricketson tried to get Sean to calm down.

¶20 Sean went to the back room prompting Ricketson to ask Appellant if she could put her gun back in her car. Ricketson made this request because Sean seemed fixated on the fact Appellant was carrying a gun in her crossbody bag. Appellant told her mother that no, she couldn't put the gun in her car, because if Sean attacked her she would have no way to defend herself. Ricketson testified that it did not bother her that Appellant was armed in the apartment that day.

¶21 Sean continued his tirade, yelling obscenities at Appellant in the kitchen. Sean called Appellant "a fat Paul Blart motherfucker" and a "dike fucking bitch." Sean yelled that if Appellant was a guy he would "beat [her] ass." When Appellant told him to just stop, Sean responded with "fuck you." At some point, Sean threw a glass of ice across the room.

¶22 Sean then attempted to borrow his mother's car again so he could leave but Ricketson refused. Appellant told Sean that he was not taking their mother's car anymore, and that he was not getting any more of his mother's money because of his addiction to drugs. This prompted Sean to put his forehead against Appellant's forehead and go literally "nose to nose" with his sister--their noses were in fact touching, and he was pressed up against her face. Sean told Appellant he was "going to beat [her] fucking ass like a man" and then shoved her head back with his.

¶23 Sean became angrier and continued hurling insults at Appellant, telling her they should "get it on man to man" and "[l]et the balls swing" but that they couldn't because of course she didn't have any. Appellant moved to the area near the front door, with her back towards the wall. Sean continued to tell Appellant he was going to "beat [her] ass." Sean then started backing Appellant up against the wall and shouted "what are you going to do?" This prompted Appellant to place her hand inside her crossbody bag and grip her off-duty weapon, a Glock .40 caliber. Sean continued threatening to beat her, and Appellant continued telling him to "get back."

¶24 At this point, Sean's body was pushed up against Appellant and he continued pushing against her. Appellant pulled her hand up and showed Sean her firearm, but did not point her gun at him. She also continued telling Sean to "get the fuck back." Appellant's training as a police officer taught her that time and distance saved lives, and she was trying to create distance between herself and Sean by getting him to back off.

¶25 In response to being shown the gun, Sean repeated to Appellant that he was "going to beat [her] ass." Sean also asked Appellant "what are you going to do? Are you going to shoot me[?]" Appellant pulled the gun out and held it with both hands while pointing it at her brother. Sean then grabbed the barrel of the gun and slammed it into his forehead. Sean continued screaming for Appellant to shoot him, to "just shoot [him] in the forehead." When he said this, Sean's veins were popping out of his neck. Appellant did not open fire then because she couldn't bring herself to shoot her brother in the head. Instead, Appellant pushed Sean back while screaming for him to get off her.

¶26 Appellant was scared for her life. She had never seen this level of aggression from Sean, or for that matter from anyone in her entire career as a police officer. Appellant's back was up against the wall, and Sean had basically forced her into a corner inside the apartment with nowhere to go. Appellant told her mother to call 911 for help. Sean then screamed "fuck you" and raised his right arm to hit Appellant in the face. Sean was standing a few feet away, and coming towards Appellant's face with a closed fist, when Appellant pulled the trigger and fatally shot her brother.

¶27 Appellant fired a single round that struck Sean in the right side of his chest. The bullet passed through Sean's right lung, heart, liver, stomach and spleen. Appellant testified that she was "terrified" and believed Sean would have beaten her unconscious, and seriously maimed or killed her, if she had not shot him. Appellant was also concerned that Sean would kill their mother.

¶28 A toxicology exam showed that Sean had fentanyl and methamphetamine in his system at the time of his death. Appellant immediately attempted CPR when Sean fell to the ground after being shot. Appellant cooperated with authorities and sat for an interview with investigators later that day.

ANALYSIS

¶29 The district court rejected the defense claim of immunity in this case on grounds that Appellant was "arguably" a trespasser who was "potentially engaged" in illegal activity when she (1) refused to remove her gun from the apartment at the request of Martha Ricketson, the tenant of the apartment; and (2) refused to leave the apartment at the request of Sean Haddock, whom the district court concluded was a tenant at will under Oklahoma law. Because Sean occupied the apartment as a tenant at will, the district court concluded that he had the authority under a municipal Edmond ordinance as an owner or occupant to exclude Appellant from the apartment. Because Appellant shot and killed Sean after refusing his request to leave the apartment, the district court concluded that Appellant failed to show by a preponderance of the evidence that she was not engaged in an unlawful activity at the time of the homicide.

¶30 On appeal, Appellant raises two propositions: (1) that the district court erred in finding that Sean Haddock was a tenant at will and that Appellant was a trespasser potentially engaged in unlawful activity; and (2) the district court abused its discretion by failing to properly consider all relevant facts and law before concluding that Appellant failed to prove that her use of deadly force was justified. We address both claims separately below.

¶31 Proposition I. We find that relief is warranted for Appellant's first proposition. Oklahoma law provides that:

A person who is not engaged in an unlawful activity and who is attacked in any other place where he or she has a right to be has no duty to retreat and has the right to stand his or her ground and meet force with force, including deadly force, if he or she reasonably believes it is necessary to do so to prevent death or great bodily harm to himself or herself or another or to prevent the commission of a forcible felony.

21 O.S.Supp.2018, § 1289.25Id., § 1289.25(F). The term "criminal prosecution" includes charging or prosecuting the defendant. Id.

¶32 When a defendant invokes statutory immunity under Section 1289.25(F), the district court must hold a pre-trial hearing to determine if the preponderance of the evidence warrants immunity. The district court must weigh and decide factual disputes as to the defendant's use of force to determine whether to dismiss the case based on statutory immunity. The defendant has the burden of proof on the issue of whether immunity attaches to his actions. Reynolds v. State, 2022 OK CR 14516 P.3d 249Id., 2022 OK CR 14Id.

¶33 In the present case, the trial court held the requisite hearing and concluded that Appellant was not entitled to immunity from prosecution. The district court's ruling constitutes an abuse of discretion for three distinct reasons.

¶34 First, the district court's reliance upon an Edmond municipal ordinance to conclude that Appellant was arguably a trespasser was error because the State failed to properly introduce the relevant ordinance into the record. See Hishaw v. City of Oklahoma City, 1991 OK CR 122822 P.2d 1139See Hayes v. State, 1977 OK CR 220566 P.2d 1174Accord State v. Nelson, 2015 OK CR 10356 P.3d 1113Hayes, 1977 OK CR 220

¶35 Second, the district court's finding that Appellant was arguably a trespasser inside the apartment is contradicted by Ricketson's testimony establishing unequivocally that both Appellant and Sean were invited guests at her apartment at the time of the homicide. The record showed that Ricketson asked Appellant if she could put her gun in her car because Sean was fixated on it during his tirade inside the apartment. Ricketson testified that she was not bothered by Appellant having a gun inside her apartment. There is no evidence whatsoever that Ricketson withdrew her invitation that day for Appellant to be present inside the apartment for any reason, let alone for her possession of an off-duty firearm in the face of Sean's aggressive, violent behavior.

¶36 Third, there is no evidence that Sean was anything other than an invited guest to the apartment that day. Ricketson testified that she did not hear Sean tell Appellant to leave the apartment because he lived there. According to Ricketson, "if he had, he's lying." (emphasis added). The record showed that in 2022 Ricketson threw Sean out of the apartment for good and told him not to come back; that Sean did not have a key to the apartment; that Sean's name was not on the lease; that Sean had not shared bills with Ricketson since 2020; and that he never stayed at the apartment for any length of time. Indeed, Ricketson described Sean as "transient," "homeless" and someone who "lived around" with other people.

¶37 Ricketson testified that the bedroom in which the black bedroom furniture was located was not Sean's room, but instead was her room. Ricketson had redecorated the bedroom when Sean got married and moved out. Ricketson denied that she kept a bedroom for Sean but testified that he would sleep in the room when he stayed with her for a few days. The record also overwhelmingly showed that the black bedroom furniture did not belong to Sean but was instead the property of his stepmother, Marla Haddock. Ricketson testified that Sean did not have any clothes in the dressers in the bedroom. Her other adult son, however, had a new guitar case and some clothes there as well even though he did not live in the apartment. Ricketson testified that Sean's belief that he owned the furniture was simply his perspective and that ownership of the furniture was not her issue.

¶38 Sean did receive some mail at Ricketson's apartment. But her other adult son also received mail there and he had not lived there since 2015, when he turned eighteen and left home. Ricketson testified that she also received mail at her current address for other people whom she does not know. The point being that it is not unusual for mail to continue being delivered to previous occupants well after they have left a residential address.

¶39 Sean's occasional overnight stays in the past at his mother's apartment as an invited guest were insufficient to establish a landlord-tenant relationship, or a tenancy in which Sean had possession of the apartment and the right to exclude Appellant over Ricketson's wishes. Ricketson was not the owner of the apartment, and Sean's name was not on the lease. There is no evidence in the record whatsoever that he possessed the premises at the time of the homicide with assent of the owner/landlord. To be a tenant at will, one must holdover with the assent of the landowner. The record simply does not support that the tenancy at will statute applies here. See 41 O.S.2021, § 141 O.S.2021, § 8Hancock v. Maurer, 1924 OK 862229 P. 611

¶40 Even if the presumption of tenancy were indulged based on the time period Sean spent at the apartment in the hours prior to his death, the presumption would be overcome by the evidence showing that Ricketson was moving out of the unit with Appellant's assistance at the time of the homicide; that Sean's presence that day was limited to collecting any of his belongings before his mother vacated the premises; that Sean's name was not on the lease; and the total absence of proof that Sean had any relationship whatsoever with the third-party owner/landlord of the apartment, let alone consent from same to occupy the dwelling. See Okla. Produce Co. v. Cotton Products Co., 1925 OK 717239 P. 656

¶41 Because Sean had no rental agreement with the landlord, and there is no evidence the landlord consented to creating a tenancy with him, Sean had no right to occupy the dwelling unit in the first place under the Residential Landlord and Tenant Act, which is the governing provision. See 41 O.S.2021, §§ 103

¶42 Further, the record plainly showed that Appellant was an invited guest at the apartment that day who was helping her mother move out to get away from Sean. There is no evidence whatsoever of unlawful activity by Appellant at the apartment. Nor is there evidence showing she was a trespasser. Appellant was an invited guest of Ricketson, who was in a place she had the right to be at the time of the homicide. Ricketson never withdrew her consent for Appellant's presence inside the apartment and never asked her to leave. Sean was also an invited guest of his mother that day, but the record shows that his role was limited to moving out any personal belongings of his that remained at his mother's apartment. At this point, Sean had no authority to exclude Appellant (or anyone else) from the premises. It is true that Sean disputed the ownership of the black bedroom furniture, but the State's evidence established overwhelmingly that Sean's father and stepmother were the rightful owners, not him.

¶43 Under the total circumstances presented, the district court abused its discretion in finding that Appellant failed to show by a preponderance of the evidence that she was not engaged in unlawful activity. The record shows unequivocally that Appellant was not engaged in unlawful activity at the time of the homicide. This same evidence, relatedly, showed that Appellant was in a place she had a right to be. Appellant's first proposition is granted.

¶44 Proposition II. In her second proposition, Appellant contends that the district court failed to conduct a proper legal analysis of all the factors set forth under Section 1289.25(D). By focusing its analysis upon Appellant's purported unlawful presence, Appellant contends the district court did not address the remaining factors, particularly whether Appellant was attacked in a place she had a right to be, and whether Appellant reasonably believed it was necessary to use deadly force to prevent death or great bodily harm to herself or another, or to prevent the commission of a forcible felony.

¶45 We agree. On remand, the district court shall analyze the remaining factors by weighing the evidence, resolving any factual disputes as to Appellant's use of force and making the requisite findings of fact and conclusions of law necessary to resolve the immunity claim. This task belongs to the district court in the first instance. Relief is granted for Proposition II.

DECISION

¶46 The district court's ruling denying immunity from criminal prosecution is REVERSED AND REMANDED for further proceedings consistent with this opinion. Pursuant to Rule 3.15, Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch.18, App. (2025), the MANDATE is ORDERED issued upon the delivery and filing of this decision.

AN APPEAL FROM
THE DISTRICT COURT OF OKLAHOMA COUNTY
THE HONORABLE SUSAN STALLINGS, DISTRICT JUDGE

 
 
 APPEARANCES AT HEARING
 
 J. PATRICK QUILLIAN
 BAYLEIGH ADAMS
 PHILLIPS, COVENTON,
 QUILLIAN & BANNER, PLLC
 1900 NW EXPRESSWAY
 SUITE 601
 OKLAHOMA CITY, OK 73118
 COUNSEL FOR DEFENDANT
 
 
 ROBERT MCCLATCHIE
 ASST. DISTRICT ATTORNEY
 OKLAHOMA COUNTY
 211 N. ROBINSON, SUITE 700
 OKLAHOMA CITY, OK 73102
 COUNSEL FOR THE STATE
 APPEARANCES ON APPEAL
 
 J. PATRICK QUILLIAN
 BAYLEIGH ADAMS
 PHILLIPS, COVENTON, QUILLIAN & BANNER, PLLC
 1900 NW EXPRESSWAY
 SUITE 601
 OKLAHOMA CITY, OK 73118
 COUNSEL FOR APPELLANT
 
 
 ROBERT MCCLATCHIE
 ASST. DISTRICT ATTORNEY
 OKLAHOMA COUNTY
 211 N. ROBINSON, SUITE 700 OKLAHOMA CITY, OK 73102
 COUNSEL FOR APPELLEE
  
 
 

OPINION BY: HUDSON, J.
LUMPKIN, P.J.: CONCUR
MUSSEMAN, V.P.J.: CONCUR
LEWIS, J.: CONCUR
ROWLAND, J.: CONCUR